IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHAZ BUNCH, | ) | CASE NO. 1:09CV0901 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE POLSTER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| KEITH SMITH, Warden, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2).

Before the court is the petition of Chaz Bunch ("Bunch") for a writ of habeas corpus filed

pursuant to 28 U.S.C. § 2254 on July 17, 2008.  Bunch is in the custody of the Ohio

Department of Rehabilitation and Correction pursuant to journal entry of sentence in the

case of *State of Ohio vs. Bunch*, Case No. 01 CR 1024 (Mahoning County 2002).  For

the reasons set forth below, Bunch's first, second, fourth, and fifth grounds for relief

should be dismissed and final judgment stayed pending resolution of *Graham v. Florida*,

No. 08-7412, in the United States Supreme Court and further briefing by the parties.

I.

The state appellate court reviewing Bunch's conviction found the following facts

to be relevant to his case:

{¶ 2} Early in the evening on August 21, 2001, Jason Cosa, Christine Hammond

and Jason's grandfather were returning to Jason's home located at 190 Maywood, Youngstown, Ohio.  (Tr. 808, 814).  After they had entered the driveway, a man wearing a mask (later admitted to being Brandon Moore), approached the car and robbed them at gunpoint.  (Tr. 809-811, 826).

{¶ 3} Neither Jason nor Christine could identify who the gunman was, but they did notice that he got into an awaiting vehicle that was a dark, older automobile. Both described the car as being dark and very loud. (Tr. 813, 829).

{¶ 4} Later that night at approximately 10:20 p.m., M.K., a twenty-two year-old Youngstown State University student, arrived at a group home for mentally handicapped women to report to work for the evening; she worked the night shift. (Tr. 850, 854).  The group home she worked at was located at 1322 Detroit Avenue, Youngstown, Ohio.  (Tr. 855).

{¶ 5} Upon arriving, she exited her vehicle and went to get her belongings out of the trunk of her car.  (Tr. 855).  On her way to the trunk, M.K. noticed an older, black automobile (referred to as black automobile) coming up the street and stopping a few houses away.  (Tr. 862-863).  At this point, she also saw a tall man running through the grass.  (Tr. 863).  The man wearing a mask, later identified as Brandon Moore, pointed a gun at her and instructed her to give him all her money and belongings.  (Tr. 864).  The porch light of the group home then came on and Moore instructed her to get into the passenger seat of her car.  (Tr. 864).  Moore climbed over M.K., positioned himself into the driver's seat, and drove away with her in the car.  (Tr. 864).

*2 {¶ 6} Upon leaving the driveway, Moore, driving M.K.'s car, began following the black automobile.  Shortly thereafter, Moore stopped the car and a second gunman exited the black automobile in front of them and entered the victim's car through the rear passenger's side door.  (Tr. 870).  The second gunman, later identified as Bunch, put a gun to her head and demanded her money and belongings.  (Tr. 873).  She now had two guns pointed at her, one from Moore and one from Bunch,  (Tr. 874).  After Bunch had entered the vehicle, Moore began to drive and continued to follow the black automobile.

{¶ 7} As all of this was occurring, Moore began to compliment M.K. on her beauty.  Moore then, while driving, inserted his fingers into her vagina.  (Tr. 876-877).  Moore was so infatuated with her that he nearly hit the black automobile in front of them.  (Tr. 877).  It was at this point that M.K. was able to see the license plate of the black automobile.  She memorized the license plate number as "CTJ6243."  (Tr. 872).  While all this was occurring, Bunch still had the gun pointed at her head.

{¶ 8} At some point while Moore was driving, the black automobile stopped leading and began to follow Moore.  Eventually, Moore drove down a dead-end

2

street near Pyatt Street in Youngstown, Ohio, and both automobiles pulled into a gravel lot.  (Tr. 879, 881, 1038-1039).  Bunch ordered M.K. out of the car. ( Tr. 884).  Moore and Bunch then took turns orally raping her; one of them would have his penis in her mouth, while the other would force her head down.  (Tr. 887-888).  Guns were pointed at her while this was occurring.  (Tr. 888).

{¶ 9} After Moore and Bunch were finished orally raping her, they forced her at gunpoint to the trunk of the car.  (Tr. 889).  At the trunk of the car, she was anally raped.  (Tr. 893).  While this was occurring one of the individuals from the black automobile, who was later identified as Jamar Callier, went through her belongings in the trunk and took some of the items.  (Tr. 890).  The other individual in the black automobile stayed in the car the whole time and watched; he was later identified as Andre Bundy.

{¶ 10} After the anal rape occurred, Bunch threw M.K. to the ground and then Moore and Bunch vaginally and orally raped her.  (Tr. 895).  While one of them vaginally raped her, the other would orally rape her, and then they would switch places.  (Tr. 895-896).  Both were armed as this occurred.  (Tr. 895).

{¶ 11} At some point while this was occurring, Bundy told Callier to stop what was going on.  As a result, Callier pushed Bunch off M.K., helped her to her feet, and put her in her car.  (Tr. 897, 1265-1266).  This caused an altercation between Bunch and Callier.  (Tr. 899).  Bunch wanted to kill M.K., however, Callier told Bunch that he could not kill a pregnant woman.  (Tr. 899).  During the rapes, M.K. was pleading for her life and as part of that plea she claimed to be pregnant.  (Tr. 893).  Prior to her leaving, Moore and Bunch told her that they knew who she was and threatened to harm her and her family if she ever told what happened.  (Tr. 900).

**\*3** {¶ 12} Once in her car, M.K. locked her doors and drove straight to her boyfriend's parents' house.  While she was driving she kept repeating the license plate number of the car.  (Tr. 902).  Upon arriving at the house, the victim was hysterical, but she was able to scream out the license plate number, which someone wrote down.  Her boyfriend's parents then immediately took her to the hospital.  (Tr. 902).  She arrived at the hospital at approximately 11:12 p.m.  (Tr. 1029-1030).

{¶ 13} At the hospital, her boyfriend's father immediately told Officer Lynch from the Youngstown Police Department that M.K. had been raped by individuals in an older black automobile with the license plate number "CTJ6423."  (Tr. 1028).  Officer Lynch was at the hospital for an unrelated matter, but when this information was given to her, she began broadcasting the plate number and the car's description over the police radio; this occurred at approximately 11:13 p.m. (Tr. 910, 1027, 1029-1030).  Officer Lynch then began obtaining further information from the victim, including a detailed description of the assailants and

3

the crimes.  Officer Lynch broadcasted the description of the assailants over the police radio.

{¶ 14} While this investigation was occurring, a sexual assault nurse at the hospital examined M.K. and completed a rape kit.  The rape kit included swabs of the victim's mouth, vagina, and rectum.  (Tr. 1588-189).  Once completed, the rape kit was sealed and taken into police custody.  (Tr. 1045-1050).

{¶ 15} At approximately 11:30 p.m. Youngstown Police Officer Anthony Vitullo, who was on patrol and had heard Officer Lynch's broadcast, pulled his cruiser into the Dairy Mart at the intersection of Mahoning Avenue and Bella Vista.  He noticed a black car at pump seven.  (Tr. 1061).  As the car was pulling out he noticed that the license plate number on the car as "CTJ6243."  (Tr. 1061).  The plate number was not the exact number that had been broadcasted over the radio, however, the numbers were very close. The number broadcasted over the radio was "CTJ6423."  Given that the car matched the description and that the license plate number was very similar to the one broadcasted, Officer Vitullo began following the car.

{¶ 16} The black automobile pulled onto Mahoning Avenue and headed east toward downtown.  (Tr. 1062).  It then merged onto I-680 southbound and exited at the first exit, Glenwood Avenue.  (Tr. 1063).  The black automobile then ran the stop sign, turned southbound on Edwards Street, and pulled into the first driveway on the west side of the street.  (Tr. 1063, 1065).

{¶ 17} Officer Vitullo followed the car the whole time; however, he did not activate his overhead lights.  Upon arriving at the Edwards Street address, Officer Vitullo remained at his car waiting for backup before approaching the car.  (Tr. 1065-11067). Moments later backup arrived, including Officer Schiffhauer from the YPD K-9 unit.  The officers proceeded to the car.  Upon reaching the car, the officers noticed that the driver of the vehicle had fled on foot.  However, the passengers, Moore, Bundy, and Callier, remained in the vehicle and were subsequently arrested and detained.  The passengers informed the police that the driver's name was "Shorty Mack."

*4 {¶ 18} At that point, the K-9 unit began trying to track the driver of the vehicle.  Officer Schiffhauer was unable to track and find the driver, but he was able to determine that the driver headed west. ( Tr. 1111).

{¶ 19} At 11:50 p.m., Youngstown Police Officer Ronnie Jones heard the broadcast that the driver from the suspected automobile had fled on foot.  (Tr. 1152-1155).  He then set up a perimeter and positioned his cruiser on Glenwood Avenue near Bernard Street in Volney Rogers parking lot.  (Tr. 1155).  Approximately five minutes later Officer Jones noticed Bunch "trotting" by on Glenwood Avenue.  (Tr. 1157-1158).  Officer Jones placed the spotlight on

Bunch and Bunch slowed to a walk.  (Tr. 1157-1158).  Bunch proceeded to the side door of 349 Glenwood Avenue and began knocking.  (Tr. 1158-1159).

{¶ 20} Lamont Hollingshead lived at 349 Glenwood Avenue.  He opened the door when Bunch knocked, but Hollingshead would not let Bunch in because he did not know who Bunch was.  Hollingshead testified that Bunch claimed to being chased by the police for a curfew violation.  (Tr. 1184-1185).  Bunch asked Hollingshead to tell the police he was Bunch's uncle.  (Tr. 1184).  Believing that the police were after Bunch for a curfew violation, Hollingshead complied with Bunch's request.  (Tr. 1184).

{¶ 21} Officer Jones questioned both Hollingshead and Bunch.  Bunch informed the officer that he was sixteen years old, that his name was Chaz Bunch, and that he was on his way from his uncle's house to his cousin's house.  (Tr. 1159-1161).  Given the explanation and the fact that Bunch did not match the description of the driver that was broadcasted over the police radio, Officer Jones let Bunch go.  The description broadcasted over the radio was that the driver was wearing gray sweats and went by the name of "Shorty Mack."  (Tr. 1161-1162, 1167-1169).  Bunch was wearing navy blue pants, a navy blue top with a white T-shirt underneath it.  (Tr. 1164).  Moore was wearing gray sweatpants, thus, the wrong description was broadcasted over the radio.  (Tr. 1162).

{¶ 22} After Officer Jones left, Bunch paid Hollingshead to make a telephone call from his house.  Bunch called Brandy Miller; Brandy Miller's testimony and telephone records confirmed this.  (Tr. 1195-1198, 1572-1573).

{¶ 23} Three days later, while at roll call, Officer Jones was informed that the subject that fled the automobile on the night of the rape was suspected to be Bunch.  Officer Jones informed his superiors that on the night of the rape he had seen an individual who identified himself as Chaz Bunch.  Officer Jones was shown a photo array with Bunch in it; he identified Bunch as the individual he saw on the night of the rape.  Bunch was subsequently arrested.

{¶ 24} During the investigation of the rape, the police inventoried the black automobile.  In inventorying the car, the police found the victim's belongings.  (Tr. 1071-1073, 1097, 1206-1208, 1211-121).  The police also found a vehicle registration and credit union card belonging to Jason Cosa.  (Tr. 1213, 1251, 1406-1407).  Also in the car was a .38 caliber handgun and one blue and one black wave cap.  (Tr. 1073-1074, 1097, 1208-1209).

**\*5** {¶ 25} Additionally, in further investigating the crimes, the police interviewed M.K.  On August 22, 2001, M.K. was shown a series of photographic line-ups.  (Tr. 910-911, 1425, 1433).  She positively identified Bundy as the driver of the dark older automobile that watched the entire time .  (Tr. 913, 14488).  She also identified Callier as the person who went through her trunk and as the person

who stopped the rape.  (Tr. 913-914, 1451-1452).  She identified Moore as the first gunman who abducted, robbed and raped her.  (Tr. 919-920, 1446).  She signed each individual photograph indicating the identifications.  (Tr. 913, 920, 1446, 1448, 1451).

{¶ 26} As to Bunch's identification, she was drawn to the photograph of him as being the second gunman, but she informed the detectives that she wanted to see a full body picture before signing the photograph.  The police were unable to put together a full body array because they were unable to find juveniles of that build.  (Tr. 1450).  However, on September 7, 2001, the victim saw a local newspaper which showed a picture of Bunch from mid-chest up.  Upon seeing this picture, the victim immediately knew that Bunch was the second gunman and called her victim-witness advocate to inform her of this information.

{¶ 27} Furthermore, evidence that was obtained during the investigation was sent away for fingerprint and DNA testing.  The rape kit was tested at BCI.  The semen sample from the vaginal swab, rectal swab and the victim's shorts were not consistent with Bunch's DNA.  However, it was determined that Moore could not be excluded; the chance of finding another individual with the same DNA as Moore was one in 94,000,000,000,000,000,000.  (Tr. 1670).  No fingerprints were found on the .38 caliber gun.

{¶ 28} The police also obtained the video surveillance from Dairy Mart.  Still pictures were made from the video surveillance.  The pictures showed Callier and Bunch purchasing food and gas for pump seven.

{¶ 29} Also, the police conducted interviews with the suspects.  On August 22, 2001, Andre Bundy was interviewed by the police.  Bundy admitted to being the driver of the black automobile.  (Tr. 1419).  Bundy also stated that he had Callier stop the rape.  (Tr. 1421).

{¶ 30} Moore was interviewed on August 23, 2001.  He informed the detective that he was the individual who robbed Cosa and Hammond.  He stated that he was the individual who first approached M.K. and forced her into her car at gunpoint.  He then admitted to raping her.  (Tr. 1431).  However, he claimed that he committed the crimes because an individual known as "Shorty Mack" made him do it.  (Tr. 1464).  He also claimed that the gun he used that night was a fake.  (Tr. 1472).

{¶ 31} Callier was then interviewed by the police and also testified at trial.  (Tr. 1276-1400).  He testified that both Bunch and Moore raped M.K.  (Tr. 1264).  He stated that Bunch was the driver of the black automobile when it left the Dairy Mart.  He then stated that once Bunch pulled the car into the house on Edwards Street, Bunch told them to tell the police that he was "Shorty Mack."  (Tr. 1274).  Callier also saw the pictures from Dairy Mart and indicated that he and Bunch

6

were in the pictures.  (Tr. 1276).

**\*6** {¶ 32} Bunch was later indicted on three counts of aggravated robbery (count one was for the robbery of M.K., counts two and three were for the robbery of Cosa and Hammond), three counts of rape, three counts of complicity to rape, one count of kidnapping, one count of conspiracy to commit aggravated robbery, and one count of aggravated menacing.  Firearm specifications were attached to all counts, except for the aggravated menacing count.  Bunch pleaded not guilty to all counts.

{¶ 33} Numerous pretrial motions were filed by Bunch including a request for discovery and a request for the trial court to order that all law enforcement officials involved in the investigation turn over and advise the state of information acquired during the course of the investigation.  The trial court sustained both motions.  The state also filed pretrial motions including a motion to join Bunch's case with Moore, Bundy and Callier (prior to Callier entering a plea agreement with the state).  The trial court granted the motion and the cases proceeded to trial.

{¶ 34} The jury found Bunch guilty of ten of the twelve counts.  He was found guilty of the three counts of rape, three counts of complicity to rape, one count of aggravated robbery, conspiracy to aggravated robbery, kidnapping, menacing, and all related firearm specifications.  He was found not guilty on the two counts of aggravated robbery with firearm specifications that were related to Cosa and Hammond.

{¶ 35} On October 23, 2002, the trial court sentenced Bunch to maximum, consecutive sentences on all charges except for the misdemeanor menacing verdict, which was ordered to be served concurrently.  Accordingly, Bunch was sentenced to serve eighty-eight years for the felonies and twenty-seven years for the firearm specifications, for a total of one hundred fifteen years.

*State v. Bunch*, 2005 WL 1523844, at \*1-\*6 (Ohio App. June 24, 2005).

Bunch timely appealed his conviction and sentence.  Bunch raised four

assignments of error in his appeal:

### Assignment of Error No. I

The trial court erred in joining the appellant's case with Brandon Moore's and Andre Bundy's case for trial [and, subsequently, refusing to sever said cases] based on the existence of antagonistic defenses and the admission of statements of Moore and Bundy that were inadmissible pursuant to *Bruton v. United States*, 391 U.S. 123 (1968).

7

Assignment of Error No. 2

The trial court erred in refusing to grant appellant's motion for a mistrial made during trial based upon the State's failure to timely disclose discoverable material.

Assignment of Error No. 3

The appellant was denied his constitutional right to a fair trial due to the cumulative effects of evidence admitted in violation of the evidence rules and rules of criminal procedure and well established principles of law.

Assignment of Error No. 4

The trial court erred in imposing maximum, consecutive sentences upon appellant.

Assignment of Error No. 5

The trial court erred in imposing multiple, consecutive terms of imprisonment for the firearm specifications as all of the felonies were committed as part of the same act or transaction.

On June 24, 2005, the state appellate court affirmed the trial court in part and reversed it in part. The state appellate court vacated the conviction and eight year sentence for conspiracy and vacated the sentence for the related firearm specification. The appellate court affirmed the other convictions, but found that the trial court failed to comply with the felony sentencing statute by failing to make requisite findings and failing to give reasons when imposing maximum and consecutive sentences. Consequently, the appellate court reversed and vacated the underlying sentences. The appellate court also reversed the trial court's imposition of consecutive three-year sentences for all the firearm specifications, finding that, at most, the trial court could have imposed three concurrent terms of three years' duration for those specifications. The appellate court remanded the case for re-sentencing with the admonition that the trial court could not

8

sentence Bunch to more than a total of 89 consecutive years' imprisonment.

Bunch timely appealed the appellate court's decision to the Ohio Supreme Court.

In his memorandum in support of jurisdiction, Bunch asserted four propositions of law:

Proposition of Law No. I:  A trial court may not impose non-minimum, maximum or consecutive prison terms in the absence of jury findings of the factors set forth in R.C. 2929.14(B), R.C. 2929.14(C) and 2929.14(E).

Proposition of Law No. II:  An appellate court should reverse a conviction when the trial court joins the trials of co-defendants knowing that the defendants will present antagonistic defenses.

Proposition of Law No. III:  A trial court should order a mistrial when the State fails to timely disclose discoverable material.

Proposition of Law No. IV:  A criminal defendant is denied his constitutional right to a fair trial when the cumulative effect of improperly admitted evidence is prejudicial.

On May 3, 2006, the Ohio Supreme Court reversed the state appellate court as to

Proposition of Law No. 1 and remanded the case to the trial court for resentencing

consistent with *State v. Foster*, 109 Ohio St. 3d 1, 845 N.E.2d 470 (2006).

On July 19, 2006, the trial court re-sentenced Bunch to maximum terms of

imprisonment for each of his offenses and to the maximum number of consecutive

terms allowed by law, for a total of 89 years' imprisonment.

Bunch timely appealed his re-sentencing.  Bunch raised three assignments of

error on appeal:

Assignment of Error No. 1:

The trial court erred by using a blanket policy to sentence Bunch instead of exercising its discretion.

Assignment of Error No. 2:

9

The trial court erred by imposing non-minimum, maximum and consecutive prison sentences.

Assignment of Error No. 3:

The trial court erred by imposing a sentence that is the equivalent of life without parole for a crime committed as a juvenile.

On December 21, 2007, the state appellate court affirmed the judgment of the trial court.

Bunch timely appealed the appellate court's decision.  In his memorandum in support of jurisdiction, Bunch asserted four propositions of law:

Proposition of Law No. I:  A sentence imposed for actions committed by a juvenile that is effectively life without parole violates the constitutional ban on cruel and unusual punishment.

Proposition of Law No. I:  A trial court may not follow a blanket policy of giving maximum sentences to all defendants who have been convicted of rape or one that presumes maximum consecutive sentences.

Proposition of Law No. I:  A defendant may not be resentenced pursuant to a sentencing scheme in which the presumptive minimum sentence has been eliminated subsequent to the commission of the underlying crime.

Proposition of Law No. I:  Trial counsel is ineffective for failing to raise Blakley error, and appellate counsel is ineffective for failing to raise trial counsel's ineffectiveness and plain error, when the failure to properly preserve the issue results in the affirmance of the maximum possible sentence.

On May 21, 2008, the Ohio Supreme Court denied Bunch leave to appeal and dismissed his appeal as not involving any substantial constitutional question.

During the pendency of Bunch's direct appeals, on June 12, 2003, Bunch filed in the trial court a petition to vacate or set aside judgment pursuant to Ohio Rev. Code § 2953.21.  Bunch alleged ineffectiveness of trial counsel and alleged that the trial court had lacked jurisdiction over him due to an improper juvenile bindover procedure.  The

10

trial court failed to issue a decision in response to this petition.

Bunch filed in the state appellate court, on February 8, 2006, an application to reopen his direct appeal pursuant to Ohio App. R. 26(B). Bunch alleged that appellate counsel and the appellate court had relied upon the wrong standard in determining that the admission of allegedly improper evidence had been harmless beyond a reasonable doubt. The appellate court found that it had applied the correct standard and, even if the standard had been incorrect, application of Bunch's proposed standard would not have changed the outcome of the appeal. Thus, appellate counsel's allegedly ineffective performance could not have prejudiced Bunch. Because Bunch was not prejudiced by appellate counsel's performance, the appellate court found that Bunch could not prevail on his application. For these reasons, the court denied the application. Bunch did not appeal this decision to the Ohio Supreme Court.

On July 17, 2008, Bunch filed in this court a petition for a federal writ of habeas corpus. Bunch asserts five grounds for relief in his petition:

> Ground One: The trial court violated Chaz's right to Due Process under Bruton v. United States, 391 U.S. 123 (1968) when, over his repeated objection, it tried him jointly with a co-defendant who offered an antagonistic defense.

> Ground Two: The trial court violated Chaz's right to confront his accuser when it admitted the hearsay statement of his co-defendant even though the co-defendant was not available for cross examination.

> Ground Three: Petitioner's sentence of life without the possibility of parole for acts committed while he was a juvenile violates the Eighth Amendment to the United State's [sic] Constitution prohibition against the imposition of cruel and unusual punishment.

> Ground Four: Petitioner's constitutional right to due process of law and the protection against the imposition of ex post facto law as guaranteed by the Due Process and Ex Post Facto Clauses of the United States Constitution, were violated when the trial court imposed sentences beyond the statutory maximum

that were not based on the facts found by the jury.

Gournd Five:  Petitioner was denied the effective assistance of trial and appellate counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to object to Petitioner's illegal sentence.

Respondent filed an Answer/Return of Writ on June 23, 2009.  Doc. No. 5. Bunch filed a Traverse on September 30, 2009. Doc. No. 10.  Respondent has filed a Reply to the Traverse, addressing matters first raised in the Traverse.  Doc. No. 11.  Thus, the petition is ready for decision.

II

*A.  Jurisdiction*

The Court of Common Pleas of Mahoning County, Ohio sentenced Bunch. Bunch filed his writ of habeas corpus in the Northern District of Ohio and raises claims regarding the constitutionality of his incarceration under 28 U.S.C. § 2254.

Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. . . . Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.

28 U.S.C. § 2241(a ) & (d).  Mahoning County is within this court's geographic jurisdiction.  This court has jurisdiction over Bunch' petition.

*B.    Evidentiary hearing*

The habeas corpus statute authorizes an evidentiary hearing in limited circumstances when the factual basis of a claim has not been adequately developed in

12

state court proceedings.  28 U.S.C. § 2254(e)(2).  There is no need for an evidentiary hearing in the instant case.  All of Bunch's claims involve legal issues which can be independently resolved without additional factual inquiry.

C.      *Exhaustion of state remedies*

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  28 U.S.C. § 2254(b) and (c); *Castillo v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. Macklin*, 936 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted state remedies.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

A petitioner must fairly present any claims to the state courts in a constitutional context properly to exhaust state remedies.  *Anderson v. Harless*, 489 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."  *Picard*, 404 U.S. at 275; *see also Harris v. Reeves*, 794 F.2d 1168. 1174 (6th Cir. 1986).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

The requirement that petitioners exhaust state remedies is a matter of comity between the federal government and the states:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. . . . Because "it would be unseemly in our dual system of

13

government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

*Rose v. Lundy*, 455 U.S. 509, 518 (1982) (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)) (other citations omitted).  Because exhaustion is a matter of comity, a petition containing unexhausted claims may be denied on the merits.  28 U.S.C. § 2254(b)(2).

Bunch has no state remedies available for his claims.  Because no state remedies remain available to him, Bunch has exhausted state remedies.

D.    *Procedural default*

Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . .  not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  When a petitioner

has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Procedural default occurs when a petitioner fails to present fairly to the highest state court his claims in a federal constitutional context.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Anderson v. Harless*,  459 U.S. 4 (1982).  Moreover, a failure to present a claim to the highest court in the state deprives a federal court hearing a habeas petition of jurisdiction on that issue.  *See  McKeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

If the state argues that a petitioner has procedurally defaulted his claims, the court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an  "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  A default will also be excused if petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Respondent contends that Bunch has defaulted his fourth[1] ground for relief, his contentions that re-sentencing him in accordance with *Foster* violated his right to be free of *ex post facto* laws and that trial and appellate counsel were ineffective for failing to object to this allegedly unconstitutional sentence.  According to respondent, Bunch should have raised this claim by way of objection when the trial court re-sentenced him.  Because he failed to do so, respondent continues, Bunch has procedurally defaulted this claim.  Bunch responds that although trial counsel defaulted this claim by failing to

---

[1] Respondent described this ground for relief in his Answer as Bunch's third ground for relief.  It is, in fact, Bunch's fourth ground for relief.  Bunch's Traverse indicates that he is aware of this error and that there is no confusion as to which ground for relief respondent meant to cite.  *See* Traverse at 17 n.3.

object contemporaneously, both Bunch's appellate brief and his brief to the Ohio

Supreme Court raised ineffective assistance of trial counsel for failing to make the

contemporaneous objection.  Thus, Bunch contends, he has preserved ineffective

assistance of trial counsel as cause for the procedural default of his fourth ground for

relief.

In Ohio, a claim of trial error or a claim of constitutional error must be raised at

the first opportunity to do so:

> The general rule is that "an appellate court will not consider any error which
> counsel for a party complaining of the trial court's judgment could have called but
> did not call to the trial court's attention at a time when such error could have been
> avoided or corrected by the trial court."  Likewise, "[c]onstitutional rights may be
> lost as finally as any others by a failure to assert them at the proper time."
> Accordingly, the question of the constitutionality of a statute must generally be
> raised at the first opportunity and, in a criminal prosecution, this means in the trial
> court.

*State v. 1981 Dodge Ram Van*, 36 Ohio St. 3d 168, 170, 522 N.E.2d 524, 526 (1988)

(quoting *State v. Awan*, 22 Ohio St. 3d 120, 122-23, 489 N.E.2d 277, 279-80 (1986))

(citations omitted).  The state appellate court hearing Bunch's direct appeal cited this

rule and Bunch's default of the rule, as well as addressing the merits of the claim:[2]

> {¶ 38} Bunch's second assignment of error argues that the *Foster* remedy of
> severance violates the prohibition against ex post facto laws.
>
> {¶ 39} During sentencing, Bunch did not argue that *Foster* violated the prohibition
> against ex post facto laws and thus it should not apply to him.  As such, it is not
> necessary to address the merits of his argument.  Regardless, even if we
> proceed to address the merits, this court has continually found the ex post
> argument to be meritless.  Therefore, this assignment of error lacks merit.

*State v. Bunch*, 2007 WL 4696832, at *5 (Ohio App. Dec. 21, 2007).  Moreover, the

---

[2]  Reaching the merits of a question after citing a procedural default does not waive
the default.  *Ewing v. McMackin*, 799 F.2d 1143, 1149 (6th Cir. 1986).

Supreme Court has long found Ohio's contemporaneous objection rule to be an adequate and independent state ground sufficient to bar habeas review.  *Engle v. Isaac*, 456 U.S. 107, 124-29 (1982).  Consequently, Bunch has procedurally defaulted this ground for relief.

Bunch argues that ineffective assistance of trial counsel for failing contemporaneously to object to his sentence serves as cause for his procedural default.  However, a claim of ineffective assistance of counsel must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Murray v. Carrier*, 477 U.S. 478, 489 (1986); *see also Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).  On his second direct appeal, Bunch advanced this claim in a single sentence during his presentation of a larger assignment of error.  The larger assignment of error asserted that the trial court erred in imposing non-minimum, maximum, and consecutive prison sentences as instructed by *State v. Foster*, 109 Ohio St. 3d 1, 845 N.E.2d 470 (2006), because such sentencing violates the *Ex Post Facto* and Due Process Clauses of the constitution.  Bunch argued as follows:

> No objection is needed to preserve an appellate claim to a sentence that is contrary to law under R.C. 2953.08, but if an objection was needed, and if trial counsel did not make the necessary objection, then ther error was plain under Crim.R. 52(B).  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  CrimR. 52(B).  An error "does not constitute plain error or defect under Crim.R. 52(B), unless but for the error the outcome of the trial clearly would have been otherwise."  State v. Cooperrider (1983), 4 Ohio St.3d 226, 227, quoting State v. Long (1978), 53 Ohio St.2d 91, 97.  Had this issue been more properly brought to the attention of the trial court, it would have resulted in a sentence of less than the maximum.  For the same reason, trial counsel was ineffective if he did not properly object.  Strickland v. Washington (1984), 466 U.S. 668.  [Bunch] was prejudiced because the deficient performance resulted in a higher sentence.

Appellant Chaz Bunch's Merit Brief, Answer, Exh. 19, p. 13.  The claim of ineffective

17

assistance of counsel was not raised as an independent claim on appeal but as a two-sentence adjunct to an assignment of error argued on seven pages of text. *Id.* at 7-14. As it was not raised as an independent claim, it was not preserved for use as cause for Bunch's procedural default.

Moreover, even if Bunch had preserved the claim of ineffective assistance of trial counsel, his procedural default of his fourth ground for relief would not be excused because he would be unable to show prejudice. Ohio courts and federal courts considering the questions have consistently ruled that the holding in *Foster* does not violate the *Ex Post Facto* Clause or the Due Process Clause of the federal constitution. *See infra*, pp. 34-39, *and cases cited at Dean v. Timmerman-Cooper*, 2009 WL 3261634, at *7 (N.D. Ohio Oct. 8, 2009). As the claimed violation was without merit, Bunch was not prejudiced by the failure to object to the alleged violation contemporaneously.

Bunch defaulted his fourth ground for relief, does not demonstrate cause and prejudice for the default, and does not claim actual innocence. Thus, the default should not be excused. For these reasons, Bunch's fourth ground for relief should be dismissed.

III.

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus. As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

18

adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. *Carey v. Musladin*, 549 U.S. ___, 127 S. Ct. 649, 653 (2006); *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000). Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction. *Carey*, 127 S. Ct., at 653.

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404-05 (emphasis added by the quoting court). A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result. *Id.* at 405-06. "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* at 405. A decision involves an unreasonable

19

application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand.  *Doan v. Brigano, 237 F.3d 722, 729-31 (6th Cir. 2001)*.  The court will examine Bunch's remaining grounds for relief using the deferential standard applied to state court rulings on the petitioner's claims.

A.    *Ground one:  The trial court denied Bunch due process when it tried him jointly with co-defendants over Bunch's objections*

Bunch contends in his first ground for relief that the trial court denied him due process, as described in *Bruton v. United States*, 391 U.S. 123 (1968), when it tried him with co-defendant Brandon Moore ("Moore"), a co-defendant who offered an antagonistic defense, over Bunch's repeated objections.  The Supreme Court analyzed *Bruton*, however, as a violation of the Confrontation Clause of the Sixth Amendment.  *See Bruton*, 391 U.S. at 126 ("We hold that . . . admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.").  Depriving a defendant of the right to confront opposing witnesses is a violation of due process, as *Bruton* itself notes, as well as a violation of the Confrontation Clause.[3]   Consequently, the claims stated in Bunch's first ground for relief, alleging a violation of due process pursuant to *Bruton*, and in his second ground for relief, alleging a violation of the Confrontation Clause, are actually the same claim and will be analyzed in the next section.

B.    *Ground two:  The trial court denied Bunch his right to confront his accusers when it admitted the hearsay statement of a co-defendant who was not available for*

_____

[3]  *See Bruton*, 391 U.S. at 130 n.5 (following *Pointer v. State of Texas*, 380 U.S. 400, 405 (1965))..

*cross-examination*

Bunch argues in his second ground for relief that the court violated his right to confront his accusers when it permitted the introduction of out-of-court statements made by non-testifying co-defendants Andre Bundy ("Bundy") and Moore to be admitted against them.  Respondent replies that because the alleged any violation of Bunch's constitutionally-protected rights did not prejudice Bunch, he is not entitled to habeas relief.

The Confrontation Clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  The principle applies to both federal and state prosecutions.  *Pointer v. Texas,* 380 U.S. 400, 406 (1965).  The right of confrontation requires, *inter alia*, that the testimonial statements of a witness who does not appear at trial may not be introduced against a defendant unless the witness is unavailable and the defendant has had an opportunity to cross-examine the witness.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  The only exceptions to this rule are the exceptions available in common law at the time of the founding.  *Id.* at 53-59 (citing *Mattox v. United States,* 156 U.S. 237, 243 (1895), and other cases).

Not all violations of the right to confront witnesses, however, entitle a petitioner to habeas relief.  In *Brecht v. Abrahamson,* 507 U.S. 619 (1993), the Supreme Court held that a court considering a collateral review of a conviction should weigh constitutional "trial error"[4] by (1) evaluating the error in the context of the entire record; (2) asking

---

[4]  According to the Supreme Court,

whether the trial error had a substantial and injurious effect on the jury's verdict, and (3) granting relief only if there is grave doubt about whether the error was harmless.  *Id.* at 638; *see also Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (holding that a court may not grant habeas relief pursuant to *Brecht* unless it believes that the error had a substantial and injurious effect on the jury's verdict).  Federal courts sitting in habeas review use the standard described in *Brecht* to determine whether a violation of the confrontation clause was harmless error.  *Fry v. Pliler*, 551 U.S. 112, 122 (2007); *see also Peterson v. Warren*, 311 Fed. Appx. 798, 804, 2009 WL 383730, at *6 (6th Cir. Feb. 17, 2009) (citing *Harrington v. California,* 395 U.S. 250, 253-54 (1969)).

Bunch was tried with two co-defendants,  Moore and Bundy, despite his objections to the joinder.  Bunch and Moore had defenses that were antagonistic to each other:  Bunch contended that he was innocent because an individual named "Shorty Mack" committed the crimes, while Moore contended that he was innocent because "Shorty Mack" forced him to commit the crimes.  Evidence at trial identified Bunch as "Shorty Mack."

---

> [t]rial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]."  *Id.,* at 307-308.  At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards."  *Id.,* at 309. The existence of such defects--deprivation of the right to counsel, for example--requires automatic reversal of the conviction because they infect the entire trial process.  See *id.,* at 309-310.  Since our landmark decision in *Chapman v. California,* 386 U.S. 18 (1967), we have applied the harmless-beyond-a-reasonable-doubt standard in reviewing claims of constitutional error of the trial type.

*Brecht*, 507 U.S. at 629-30.

22

In establishing his defense of duress, Moore introduced testimony from Officer Steven Shiffauer that Bunch, his co-defendants, and Callier were wearing red bandanas that could indicate they were members of the Bloods street gang.  He also introduced testimony from Callier that Callier was afraid of Bunch.  Moore also elicited testimony from Officer Jerome Shuster describing Moore's confession to the robbery and rape at issue, the confession being limited to Moore's own involvement in the crimes and describing Moore's allegations that "Shorty Mack" threatened him with a gun to force him to participate in the rape.  Shuster also testified that Moore told him that "Shorty Mack" directed Moore to tell the police that "Shorty Mack" was "Eric."  Finally, Moore elicited testimony from Shuster that Shuster had later learned the individual Moore identified as "Shorty Mack" was Bunch and that the alias Bunch gave the police when he was arrested was "Eric Coffer."  In closing arguments, Moore's counsel emphasized Bunch's aggressiveness throughout the evening during which the crimes were committed and reviewed the evidence establishing him as "Shorty Mack."

The state introduced evidence through the testimony of Jamar Callier ("Callier") that Bunch was "Shorty Mack."  The state also introduced Bundy's confession describing the rape through the testimony of Shuster.  Shuster testified that Bundy said he had sent Callier back to "the other two" to stop the rape and that Bunch drove the car away from the scene of the rape.  Otherwise, Shuster's testimony did not name Bunch.

In addition, at one point Moore's counsel asked Callier, "In fact, you know that he [Bunch] killed a man named Brandon Pete, don't you?"  Transcript of Proceedings ("Tr."), Supplement to Return of Writ, Doc. No. 6, p. 1332.  Bunch's counsel objected before Callier could answer, and there was a sidebar.  At the end of the sidebar, the

23

court instructed the jury that the question had been improper and that they were to regard the question as having never been asked.

Because neither Moore nor Bundy testified, Bunch was unable to cross-examine them regarding their accounts of the rape, particularly the role played by "Shorty Mack" in the rape; Moore's linking of "Shorty Mack" with "Eric"; and their assertions that they were afraid of Shorty Mack.

Bunch argued in state court that he was prejudiced by joinder with Moore because he and Moore had two mutually antagonistic defenses and because, *contra Bruton*, the trial referred to statements of non-testifying co-defendants. Bunch further argued that his inability to cross-examine his co-defendants violated his right to confront the witnesses against him. In addressing the first argument, the state appellate court found that Bunch's and Moore's defenses were, indeed, mutually antagonistic and that the two co-defendants should not have been tried together. The court also found, however, that Bunch was not prejudiced by the joinder. According to the appellate court, most of the testimony elicited to support Moore's defense of coercion and to which Bunch objected was either not prejudicial or was only mildly prejudicial. The exceptions were testimony that linked Bunch with a gang and a question by Moore's attorney to co-defendant Callier, "In fact, you know that [Bunch] killed a man named Brandon Pete?" In assessing the resulting prejudice to Bunch, the appellate court wrote:

> {¶ 79} . . . [T]here are a few glaring points in this case that lead to the conclusion that prejudice did not result from the joinder. First, Bunch was found guilty of all crimes against M.K ., however, the jury found him not guilty of the two counts that involved crimes against Cosa and Hammond.

24

{¶ 80} As the Second Appellate District explained, one of the reasons prejudice may result from joinder when antagonistic defenses are presented is because there is a fear that the jury will infer both defendants guilty for the sole reason that their defenses conflict. *Brown,* 2d Dist. No. 8560.  Obviously, that did not occur in this situation. Even after all the allegedly prejudicial testimony that Moore offered through cross-examination, the jury still acquitted Bunch on the charges that involved crimes against Cosa and Hammond.  Moore, on the other hand, was found guilty of all counts, i.e. he was found guilty of the crimes against M.K. and the crimes against Cosa and Hammond.

{¶ 81} This finding was supported by the evidence established at trial.  As to the charges against Cosa and Hammond, the state offered little to no evidence that Bunch was involved in these crimes.  However, Moore's statement to the police clearly implicated himself in these crimes.  The jury's finding of not guilty on these charges indicates that the jury was able to separate the evidence against the different defendants and render a verdict in conformity with that evidence.  *State v. Jacocks,* 5th Dist. No.2002CA00359, 2003-Ohio-6839.

{¶ 82} Second, the evidence against Bunch was strong.  M.K. identified Bunch as the fourth individual involved in the crime.  The physical description she gave of him matched his physical description.  The clothing description she gave matched the clothes he was wearing on that night when he was stopped by Officer Jones.  Callier also identified Bunch as the driver of the car and as the individual who he told the police was "Shorty Mack."  Callier further identified Bunch as the individual with him in the Dairy Mart photographs.

{¶ 83} The Federal Ninth Circuit Court of Appeals has explained that the touchstone of a reviewing court's analysis is the effect of joinder on the ability of the jury to render a fair and honest verdict.  *Tootick,* 952 F.2d at 1082.  Considering all of the above, we find that the antagonistic defenses did not prejudice Bunch to the point he was denied a fair trial.  The trial court's decision to give curative and limiting instructions as to any problematic or troubling testimony, instead of severing, was the least intrusive means to remedy the situation. Thus, Bunch's argument that prejudice resulted from the mutually antagonistic defenses fails.

*Bunch*, 2005 WL 1523844 at *13-*14.

On direct state appeal, Bunch argued that the testimony of police officers

describing statements made by co-defendants Bundy and Moore implicated him in

violation of *Bruton.*  The state appellate court found that most of the statements that

Bunch found objectionable fit within an exception in *Bruton* for statements redacted to

remove the name of the allegedly injured defendant.  The only statement that the appellate court found troubling was Moore's reported statement that "Shorty Mack" coerced him to commit the crimes against M.K., because Callier had testified that Bunch was "Shorty Mack."  The court did not reach any conclusion as to whether this statement violated the holding in *Bruton* because "[o]ther overwhelming uncompromised evidence established Bunch's guilt."  *Id.* at *16.  The appellate court recited the following as supporting this conclusion:

> First, M.K. positively identified him at trial as one of the individuals who raped her.  While she did not positively identify him from the photographic lineup, she explained that she thought it was him, but she wanted to see a photographic lineup showing more of the chest area to be 100% sure it was him.  Second, M . K.'s physical description given within an hour of the crimes matched Bunch's physical description.  She even accurately described the clothes he was wearing.  Officer Jones, who set up a perimeter to apprehend the fleeing driver, testified that he spotted Bunch in that perimeter within minutes of setting up the perimeter.  He testified as to the clothing Bunch was wearing that night and it matched M.K.'s clothing description.  (Tr. 1164).  Third, Callier testified on direct examination that Bunch was "Shorty Mack" and that he was the individual who committed the rapes along with Moore.  Fourth, testimony from Callier,  Officer Vitullo and the Dairy Mart video surveillance photographs established that the black automobile was at Dairy Mart, and Callier and a man having the same physical and clothing description as Bunch were there.

*Id.* at *16.  The state appellate court also found that the trial court had given the jury a proper limiting instruction on the use of this testimony.

The uncontested evidence against Bunch was overwhelming.  Moreover, although introduction of Moore's out-of-court statement linking "Shorty Mack" with "Eric" through the testimony of Shuster was improper, Callier's testimony that Bunch was "Shorty Mack" makes Moore's testimony, at most, merely cumulative.[5]  Despite the

---

[5]  Bunch objects that Callier's testimony must be considered in light of the fact that Callier had made a deal with the prosecution in return for his testimony.  That was an issue

improper evidence admitted at trial, it cannot be said that this evidence had a substantial and injurious effect on the jury's verdict or creates grave doubt about whether the error was harmless, given the weight of the evidence against Bunch.

In addition, although Bunch argues that the court's limiting instruction regarding the jury's use of Shuster's testimony was insufficient, his argument is not convincing. The court instructed the jury twice during Shuster's testimony that the testimony would ordinarily be inadmissible as hearsay, but that it was admissible at that time only for the purpose of understanding why Shuster did what he did.  The court further instructed the jury to use the testimony for that purpose only.  Bunch contends that this instruction violated the holding in *Richardson v. Marsh*, 481 U.S. 200 (1987).  *Richardson*'s holding, however, involved the circumstances under which a limiting instruction could be used to cure the introduction of an incriminating confession by a co-defendant, *contra Bruton*.  The holding did not specify the precise nature of the instruction that was required.  Bunch has not shown, therefore, that the state appellate court erred in finding that the trial court gave a proper limiting instruction regarding the use of Shuster's testimony.

For the reasons given above, Bunch cannot show that he was prejudiced by the alleged due process violations or the alleged confrontation clause violations.  Bunch's first and second grounds for relief, therefore, should be dismissed.

C.      *Ground three:  Bunch's sentence of life without parole for acts committed while a juvenile violated the Eighth Amendment prohibition against cruel and unusual punishment*

---

for cross-examination and one for the jury to take into consideration in weighing the relative credibility of Callier and Bunch.

27

Bunch contends that the trial court's effective sentence of 115 years' imprisonment amounts to a life sentence and that, as he was a juvenile when he committed those acts, the sentence of life imprisonment violated the Eighth Amendment's prohibition against cruel and unusual punishment.  In support of this argument, he cites the Supreme Court's holding in *Roper v. Simmons*, 543 U.S. 551 (2005).  Bunch also argues, in the alternative, that if this court determines that this case cannot be decided on the basis of *Roper*, the court should delay deciding this case until the Supreme Court has issued its opinion in two cases to be decided this term.[6]  Those two cases relate to whether a sentence of life imprisonment for crimes committed as a juvenile violates the Eighth Amendment.  Respondent replies that *Roper* does not apply to the facts of the instant case and that even if the Supreme Court rules that the Eighth Amendment prohibits sentencing a defendant to life imprisonment for crimes committed as a juvenile, such a rule, by virtue of the holding of *Teague v. Lane*, 489 U.S. 288 (1989), could not be applied retroactively to Bunch.

*Roper* held that sentencing a defendant to death for a crime committed as a juvenile violates the Eighth Amendment.  *Roper* does not, however, prohibit sentencing a defendant to life imprisonment on the basis of crimes committed as a juvenile.  As the Supreme Court noted in its decision in *Roper*, the death penalty is qualitatively different from other forms of punishment:

> Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force.  Capital punishment must be limited to those offenders who commit "a narrow category of the most serious crimes"

---

[6]  Those cases are *Sullivan v. Florida*, No. 08-7621, and *Graham v. Florida*, No. 08-7412.

and whose extreme culpability makes them "the most deserving of execution." This principle is implemented throughout the capital sentencing process.  States must give narrow and precise definition to the aggravating factors that can result in a capital sentence.  In any capital case a defendant has wide latitude to raise as a mitigating factor "any aspect of [his or her] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.  There are a number of crimes that beyond question are severe in absolute terms, yet the death penalty may not be imposed for their commission.  The death penalty may not be imposed on certain classes of offenders, such as juveniles under 16, the insane, and the mentally retarded, no matter how heinous the crime.   These rules vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders.

*Roper v. Simmons*, 543 U.S. 551, 568-69 (2005) (citations omitted).  There are no

similar constitutional limitations on the imposition of a life sentence. Consequently, the

holding in *Roper* prohibiting the execution of juvenile offenders cannot reasonably be

extended to a prohibition against the life imprisonment of juvenile offenders.

As regards respondent's contention that *Teague* bars the retroactive application

of a Supreme Court ruling that the constitution prohibits the life imprisonment of a

juvenile offender, respondent errs.  *Teague* held that new rules announced by the

Supreme Court were generally not to be applied retroactively on collateral review, with

two exceptions.  One of those exceptions was a rule placing "certain kinds of primary,

private individual conduct beyond the power of the criminal law-making authority to

proscribe."  *Teague*, 489 at 307 (quoting *Mackey v. United States,* 401 U.S. 667, 692

(1971)), *rev'd on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that

executions of mentally retarded criminals were cruel and unusual punishment prohibited

by Eighth Amendment).  As the Court in *Penry* explained:

In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all. . . Therefore, the first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal

29

punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.  Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.

*Penry v. Lynaugh*, 492 U.S. 302, 329-30 (1989).  Consequently, if the Supreme Court were to find that the constitution prohibits the life imprisonment of a juvenile offender, that new rule should be applied retroactively to Bunch.

The Supreme Court heard oral argument in *Sullivan* and *Graham* on Monday, November 9, 2009.[7]  The Court docket describes the questions presented by *Sullivan* as follows:

1. Does imposition of a life-without-parole sentence on a thirteen-year-old for a non-homicide violate the prohibition on cruel and unusual punishments under the Eighth and Fourteenth Amendments, where the freakishly rare imposition of such a sentence reflects a national consensus on the reduced criminal culpability of children?

2. Given the extreme rarity of a life imprisonment without parole sentence imposed on a 13-year-old child for a non-homicide and the unavailability of substantive review in any other federal court, should this Court grant review of a recently evolved Eighth Amendment claim where the state court has refused to do so?

The docket describes the question presented by *Graham* as follows:  "Whether the Eighth Amendment's ban on cruel and unusual punishments prohibits the imprisonment of a juvenile for life without the possibility of parole as punishment for the juvenile's commission of a non-homicide."

It is very unlikely that a Supreme Court ruling in *Sullivan* would affect Bunch,

---

[7] All information regarding *Sullivan* and *Graham* is taken from the Supreme Court's official website, www.supremecourtus.gov.

given the extreme youth of the appellant in that case. Moreover, *Sullivan* involves a sentence of life without parole. Although Bunch's sentence, if fully served, would amount to a life sentence, there is no indication in the record that Bunch is ineligible for parole.

*Graham* more closely resembles the instant case. *Graham* also involves a sentence of life without parole, but the appellant in that case was the same age as Bunch when Bunch committed his crimes. Thus, there is at least a possibility that a broadly-worded decision in *Graham* could affect Bunch.

Given the imminence of the Supreme Court's consideration of the issue raised in Bunch's third ground for relief and its potential effect on Bunch's petition, the court should withhold judgment on that ground for relief pending resolution of *Graham* in the Supreme Court.

D.      *Ground five: Bunch's trial and appellate counsel rendered ineffective assistance by failing to object to or appeal Bunch's sentence*

Bunch argues in his fifth ground for relief that trial counsel was ineffective for failing to object to a sentence allegedly in violation of the Due Process and the *Ex Post Facto* Clause of the federal constitution and appellate counsel was ineffective for failing to appeal that sentence. Respondent contends that as the allegation that Bunch's sentence violated the Due Process and the *Ex Post Facto* Clause is without merit, counsel were not ineffective for failing to object to the sentence on those grounds.

The standard for determining whether petitioner's counsel was ineffective is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v.*

31

*Washington*, 466 U.S. 668, 686 (1984); *see also Groseclose v. Bell*, 130 F.3d 1161,

1167 (6th Cir. 1997).  A claim of ineffective assistance of counsel has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687; *see also Groseclose*, 130 F.3d at 1167.

The first prong of this test, the showing of deficient performance, is an objective

one:  "[T]he proper standard for attorney performance is that of reasonably effective

assistance. . . . When a convicted defendant complains of the ineffectiveness of

counsel's assistance, the defendant must show that counsel's representation fell below

an objective standard of reasonableness," as judged by "prevailing professional norms."

*Strickland*, 466 U.S. 687-88; *see also Groseclose*, 130 F.3d at 1167.  Scrutiny of

counsel's performance is highly deferential to avoid second-guessing an adverse

decision.  *Strickland*, 466 U.S. at 689; *see also Groseclose*, 130 F.3d at 1167.  The

petitioner "must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at

689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Groseclose*, 130

F.3d at 1167.  A court reviewing counsel's performance "must judge the reasonableness

of counsel's challenged conduct on the facts of the particular case, viewed as of the

time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  "[S]trategic choices made after

thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable . . . ."  *Id.* at 690-91 (1984); *see also Groseclose*, 130 F.3d at 1167-6.

The second prong of the test for ineffective assistance of counsel is whether the

error prejudiced petitioner:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

*Strickland*, 466 U.S. at 690-91 (citations omitted); *see also Groseclose*, 130 F.3d at

1168.  Further "the burden rests on the accused to demonstrate a constitutional

violation."  *United States v. Cronic*, 466 U.S. 648, 658 (1984).  Showing a constitutional

violation requires showing that "counsel's unprofessional errors so upset the adversarial

balance between defense and prosecution that the trial was rendered unfair and the

verdict rendered suspect."  *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).  "Unreliability or

unfairness does not result if the ineffectiveness of counsel does not deprive the

defendant of any substantive or procedural right to which the law entitles him."  *Lockhart*

*v. Fretwell*, 506 U.S. 364, 372 (1993).  A reviewing court must ask itself "whether there

is a reasonable probability that, absent the errors, the factfinder would have had a

reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695; *see also Groseclose*,

130 F.3d at 1168.

Bunch argues that his sentence violated the Due Process and *Ex Post Facto*

Clauses because he received a sentence higher than that which the court could have

imposed at the time he committed the crimes.  Article I, § 10 of the United States

Constitution provides that no state shall pass *ex post facto* laws. U.S. Const, Art. I, § 10.

The Constitution's bar against *ex post facto* laws, however, does not apply to courts:

> The *Ex Post Facto* Clause, by its own terms, does not apply to courts.  Extending the Clause to courts through the rubric of due process . . . would circumvent the clear constitutional text.  It also would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other.

*Rogers v. Tennessee*, 532 U.S. 451, 460 (2001).

Although the *Ex Post Facto* Clause does not apply to courts, "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Id.* at 456.  In particular, the Supreme Court has found that a court may not unexpectedly and indefensibly construe a criminal statute so as to criminalize conduct which had not been criminal prior to the court's new construction.  *See Bouie v. City of Columbia*, 378 U.S. 347 (1964).  The Supreme Court has explicitly declined, however, to apply all the protections of the *Ex Post Facto* Clause to courts by way of the due process clause.  *Id.* at 458-461.

In the present case, Bunch argues that because the events specified in the indictment occurred before the decision in *Foster*, applying *Foster's* judicially-reconstructed sentencing statute in sentencing Bunch violated his right to be free from *ex post facto* laws.  Bunch cites *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1963), in support of the proposition that "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids."  *See also Rogers v. Tennessee,* 532 U.S. 451, 459 (2001).

Bunch's argument is not well-taken for three reasons.  First, the judicial enlargement of a criminal statute in *Bouie* was very different from the alleged

enlargement in *Foster*.  In *Bouie*, a South Carolina statute prohibited entry onto land after the posting of notice prohibiting such entry.  Defendants were arrested pursuant to that statute during a lunch counter sit-in for civil rights when they were ordered to leave after being notified that they were trespassing if they remained.  The defendants had not been given notice prohibiting their entry to the lunch counter prior to their entry.  Upon appeal, the South Carolina supreme court re-interpreted the relevant statute to prohibit remaining on a property after notice was given as well as entry onto the property.  The Supreme Court struck down the convictions and agreed with the appellants that South Carolina had punished them for conduct that was not criminal at the time they committed it, thus violating the requirement of the due process clause that a criminal statute give fair warning of the conduct which it prohibits.  According to the Court, "If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect."  *Bouie*, 378 U.S. at 354 (quoting Hall, GENERAL PRINCIPLES OF CRIMINAL LAW (2d ed. 1960), at 61).

*Foster* differs considerably from *Bouie*.  *Foster* did not criminalize any conduct which had not been criminal prior to the decision.  Nor did *Foster* increase the maximum penalty that could be handed down for a crime.  Rather, *Foster* excised those portions of Ohio's sentencing statute that required judicial findings of fact before a court could sentence a defendant to more than a minimum sentence or to consecutive sentences.  *Bouie* does not prohibit this.

Second, Bunch's position is foreclosed in part by *Dobbert v. Florida*, 432 U.S. 282 (1977).  Bunch contends that Ohio may not sentence him pursuant to a statute that

it modified after Bunch's criminal conduct because this fails to give him fair warning of his potential punishment.  As the Eleventh Circuit first pointed out in *United States v. Duncan*, 400 F.3d 1297 (11th Cir. 2006), *Dobbert* contradicts this proposition:

> Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers.  The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability to which the State ascribed to the act of murder.

*Duncan*, 400 F.3d at 1307-08.  Similarly, although Ohio's sentencing statutes at the time of Bunch's criminal acts were unconstitutional, they nevertheless gave him fair notice of the acts that were prohibited and the degree of punishment which the Ohio legislature wished to impose on those who committed those acts.  As the reinterpreted statute did not increase the maximum penalty to which Bunch was potentially subject, Bunch cannot say that the state failed to give fair warning of what was prohibited or of the potential penalties to which he would be subject if he committed those acts.

Third, Bunch's position is contradicted by *United States v. Booker*, 543 U.S. 220 (2005), and its progeny.  In *Booker*, the Supreme Court confronted the constitutionality of a federal sentencing statute that resembled Ohio's insofar as it required specified judicial findings of fact for upward departures from a base sentence.  The Court found that such mandatory factfinding violated the holding in *Apprendi,* and excised those portions of the statute requiring judicial factfinding before increasing a base sentence. The Supreme Court also allowed sentencing courts to engage in factfinding in determining sentences by using the previously-mandatory sentencing factors as guidelines that should be considered in sentencing.  The Court required other federal

courts to apply both parts of its holding--striking the mandatory findings on Sixth Amendment grounds and using the previously-mandatory factors as guidelines--to future cases because applying both holdings in combination best approximated the will of Congress in enacting sentencing reform.  *Id.* at 249.  Finally, the Court struck those sections of the statute requiring a relatively strict appellate review for departures from mandatory sentencing guidelines and found that the resulting statute implied appellate review under a "reasonableness" standard.  *Id.* at 259-60.

When the Ohio Supreme Court determined that Ohio's sentencing statutes violated the holding in *Blakely*, it explicitly turned to *Booker* to cure the statutes' unconstitutionality.  *Foster*, 109 Ohio St. 3d at 26-27, 845 N.E.2d at 495-96.  Thus, the Ohio Supreme Court excised those portions of the statutes requiring judicial factfinding using certain factors before making upward departures from a base sentence or before sentencing to consecutive sentences.  *Id.*, 109 Ohio St. 3d at 28-30, 845 N.E.2d at 497-98.  It also instructed Ohio courts to use the factors enumerated in the statutes as guidelines in making sentencing determinations.  *Id.*, 109 Ohio St. 3d at 30, 845 N.E.2d at 498.  Sentencing courts were thus free to sentence defendants anywhere within the sentencing ranges set by the Ohio legislature for various crimes or to consecutive sentences, using the previously-mandatory factors as guidelines to determine where in the range a defendant should be sentenced.  The resulting statutes, according to the Ohio Supreme Court, best approximated the will of the legislature in passing the sentencing statutes while doing away with the statutes' unconstitutionality.  *Id.*

Bunch argues that the severance effected in *Foster* differs from the severance in *Booker* because the statutes reshaped by *Foster* effectively eliminated the ability of an

appellate court to review a sentence and failed to carry out the Ohio legislature's goal of uniformity and proportionality in sentencing.  Even if this argument is correct, Bunch fails to cite any holding of the Supreme Court that reshaping the Ohio sentencing statutes in such a manner violates constitutionally-required due process or the prohibition against *ex post facto* laws.

A number of federal defendants have alleged that the federal sentencing statutes reshaped by *Booker* violate due process because they subject defendants to *ex post facto* laws.  Those challenges have been universally rejected.  *See United States v. Scroggins*, 411 F.3d 572, 575-78 (5th Cir. 2005); *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005); *United States v. Dupas*, 417 F.3d 1064, 1068-69 (9th Cir. 2005); *United States v. Rines*, 419 F.3d 1104, 1106 (10th Cir. 2006); *Duncan*, 400 F.3d at 1306-08; and *United States v. Alston-Graves*, 435 F.3d 331, 343 (D.C. Cir. 2006). Bunch makes no argument that distinguishes in any relevant respect Ohio's revised sentencing statutes from the revised federal sentencing statutes upheld by the appellate courts.

Because Bunch's sentence did not violate due process nor the prohibition against *ex post facto* laws, Bunch's trial counsel was not ineffective for failing to object to his sentence on those grounds, nor was Bunch's appellate counsel ineffective for failing to appeal his sentence on those grounds.  Consequently, Bunch did not have ineffective assistance of trial or appellate counsel for failing to challenge his sentence.

## IV.

For the reasons given above, Bunch's first, second, and fifth grounds for relief should be dismissed as without merit and his fourth ground for relief should be

38

dismissed as procedurally defaulted.  However, final judgment in this case should be stayed pending resolution of *Graham v. Florida* in the United States Supreme Court and further briefing by the parties regarding the effect, if any, of the Supreme Court's ruling in that case on Bunch.  Thirty days after the Supreme Court's decision in *Graham*, Bunch should file a supplemental brief with this court regarding the impact of *Graham* on Bunch's third ground for relief.  In the event that the decision is favorable to Bunch, his brief should also cite to evidence as to whether he is eligible for parole.  Respondent should file a response thirty days thereafter.


Date:  December 8, 2009                     */s/ Nancy A. Vecchiarelli*
                                            United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters, 638 F.2d 947 (6th Cir. 1981).  See also Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111.***